**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–183C.

United States Court of Federal Claims.

Sept. 10, 2003.

plaint. *See Ryan v. United States*, No. 03–617

John G. DeGooyer, Foley & Lardner, Washington, D.C., for plaintiff. Philip A. Nacke, Steven C. Lambert, and Rachel Danish Campbell, Foley & Lardner, Washington, D.C., were of counsel.

Russell A. Shultis, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant, with whom were David W. Ogden, Acting Assistant Attorney General, U.S. Department of Justice; David M. Cohen, Director, and Robert E. Kirschman, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. R. Franklin Belote, Office of the General Counsel, Supervisor of Shipbuilding Conversion and Repair, and Robert Lieblich, Office of Counsel, Naval Sea Systems Command, were of counsel.

### OPINION

SMITH, Senior Judge.

Newport News Shipbuilding and Dry Dock Company ("Newport News") brought this action to contest a finding by the government that Newport News had violated the Cost Accounting Standards (the "CAS") in accounting for the costs associated with a thrift

(Fed.Cl. March 26, 2003).

savings plan. *See* 48 C.F.R. § 9904.415 (1998). This opinion addresses the parties' cross-motions for summary judgment under the Rules of the Court of Federal Claims ("RCFC") 56(c). In its motion, Newport News argued that the thrift savings plan had complied with CAS 415. Newport News further claimed that even if the thrift savings plan had not complied with CAS 415, the government had waived CAS 415 through bilateral contract modifications. The government's cross-motion challenged Newport News' allegations, and sought a judgment of $19,535,000 plus interest in reimbursement for contract costs paid to Newport News pursuant to the thrift savings plan. After reviewing the parties' briefs and holding oral argument, the Court grants Newport News' motion and denies the government's cross-motion.

## FACTS

At the time of this dispute, Newport News, a government defense contractor, was a subsidiary of Tenneco Inc. ("Tenneco"). Tenneco had an Internal Revenue Code 401(k) qualified savings plan known as the Tenneco Inc. Thrift Plan (the "Thrift Plan"). The Thrift Plan covered all eligible employees of Tenneco and those Tenneco subsidiaries that adopted the Thrift Plan. During fiscal years 1993 and 1994, most of Tenneco's subsidiaries, including Newport News, adopted the Thrift Plan. Participating employees were able to make contributions of not more than eight percent of their base compensation to the Thrift Plan. The Thrift Plan obligated Newport News to deposit a matching value into each participating employee's Thrift Plan account. Participating employees could liquidate the account only upon termination or retirement from Newport News.

In November of 1992, Tenneco established a Stock Employee Compensation Trust ("SECT") as a vehicle to fund various employee benefit programs provided by Tenneco and Tenneco subsidiaries, including Newport News.[1] Tenneco thereafter transferred 12,000,000 shares of Tenneco common treasury stock to the SECT in exchange for an interest-bearing promissory note from the SECT in the amount of $432 million. The transferred shares were valued at $36 per share, the estimated average market value of one share of Tenneco Inc. common treasury stock on the date of the transfer of the stocks to the SECT. The agreement creating the SECT permitted Tenneco to terminate the SECT at any time. Pl.'s Mot. at Ex. 1, § 8.2 (Tenneco SECT Agreement). At such time, the SECT was required to sell all of the Tenneco shares that it held, and to distribute the proceeds of the sale to Tenneco up to an amount equal to the value of the promissory note and any accrued but unpaid interest on the note. *Id.* The SECT would then distribute any surplus funds to Tenneco employees individually or through Tenneco employee benefit plans. *Id.*

In fiscal years 1993 and 1994, Newport News matched employee contributions to the Thrift Plan with awards of Tenneco common treasury stock distributed from the SECT. Newport News made the awards at the end of each employee's pay period. The value of the awarded stock was the average of the stock's high and low price recorded on the New York Stock Exchange ("NYSE") at the end of each pay period, which never exceeded $36 per share for any of the pay periods in fiscal years 1993 and 1994. Thus, the number of shares deposited into a Newport News employee's Thrift Plan account was calculated by dividing the employee's dollar

1. The SECT funded the following Tenneco employee benefit plans:
   Thrift Plan;
   1992 Employee Stock Purchase Plan;
   Key Employee Restricted Stock and Restricted Unit Plan;
   each defined benefit pension plan funded through the General Employee Benefit Trust;
   Key Employee Stock Option Plan;
   Executive Incentive Compensation Plan;
   Board of Directors Deferred Compensation Plan;

   Supplemental Equalization Plan;
   Benefit Equalization Plan;
   Deferred Compensation Plan;
   any welfare plan as that term is defined in Section 3(1) of the Employee Retirement Income Security Act of 1974 that covers salaried employees or any trust presently existing or hereafter established to fund such welfare plans.
   Pl.'s Mot. at Ex. 1 (Tenneco SECT Agreement).

contribution to the account during the preceding pay period by the average of the stock's high and low price recorded on the NYSE at the end of the last day of that pay period. For example, if an employee contributed $360 and the stock's average price was $36, then Newport News' matching contribution would be ten shares: $360 divided by $36.

Under its contracts with the government, Newport News was not responsible for the cost of the stock that it awarded to its employees as part of the Thrift Plan. This was because the government reimbursed contractors for the cost of awards made in the contractor's own stock pursuant to deferred compensation plans, such as the Thrift Plan.[2] Newport News set the cost of the stocks it awarded according to the cash value of the Tenneco common treasury shares transferred from the SECT to an employee's Thrift Plan account at the time of the transfer. For accounting purposes, Tenneco treated the appreciation of the shares transferred to the Thrift Plan as paid-in capital.[3]

Tenneco had originally planned the SECT to have a five year life. However, in 1996, Tenneco decided to redeem the promissory note it had received from the SECT in exchange for the value of the treasury stock shares that it had transferred to the SECT. For the period beginning January 1, 1993, and ending August 16, 1996, the SECT had distributed to Thrift Plan participants only 4,387,673 of the 12,000,000 shares originally transferred to the SECT. The total number of shares distributed by the SECT to all employee benefit plans, including the Thrift Plan, was 10,044,474. Thus, the SECT converted the remaining 1,955,526 Tenneco shares that it held to cash at its then current market value, and used the cash to repay Tenneco the remaining obligation due on the promissory note.

In the summer of 1996, the Defense Contract Audit Agency (the "DCAA"), an agency within the Department of Defense responsible for auditing defense contractors, reviewed Tenneco's records. The DCAA evaluated Tenneco's Thrift Plan contributions for fiscal years 1993 and 1994 to determine whether Newport News' Thrift Plan practices complied with the CAS, which govern the accounting practices of government contractors. On February 6, 1997, the DCAA issued its final audit report. The report concluded in pertinent part that Newport News' accounting of the Thrift Plan had not complied with CAS 415–50(e)(1), which specifies the date that a contractor must use in reporting to the government the cost of awards made in the contractor's own stock as part of deferred compensation plans. On November 5, 1997, the Administrative Contracting Officer (the "ACO") in the Office of the Supervisor of Shipbuilding, Conversion, and Repair for the Department of the Navy at Newport News, Virginia, issued a conclusive Determination of Noncompliance With CAS 415 (the "Determination"). The Determination adopted the conclusions of the DCAA's final audit, finding that Newport News had violated CAS 415–50(e)(1) by wrongfully measuring the value of the Tenneco stock awarded as deferred compensation when the shares were awarded to individual Thrift Plan accounts. The Determination held that Newport News should have measured the value of the shares when they were transferred to the SECT in November of 1992, and found that Newport News' failure to adhere to CAS 415–50(e)(1) resulted in the government overpaying Newport News $19,535,000 in costs associated with the Thrift Plan.

On March 17, 1998, Newport News filed suit in this Court. Newport News sought a judgment that the Determination was erroneous, and asked us to deny the government's claim that Newport News was not in compliance with CAS 415–50(e)(1). Alternatively, Newport News asked us to determine

---

**2.** Newport News alleged in its complaint that the Thrift Plan was a defined-contribution pension plan, rather than a deferred compensation plan. However, for the sake of argument, Newport News treated the Thrift Plan as a deferred compensation plan in the present cross-motions.

**3.** "Paid-in capital" is the total amount of cash, property, and services contributed to a corporation by its stockholders. ERIC L. KOHLER, KOHLER'S DICTIONARY FOR ACCOUNTANTS 372 (6th ed.).

that the government had released Newport News from liability under CAS 415–50(e)(1). Newport News also requested that we award it the attorneys' fees and costs resulting from this matter. In Count I of the complaint, Newport News alleged that the Determination was erroneous because CAS 412 applied to the Thrift Plan, rather than CAS 415.[4] Count II stated that even if CAS 415 applied to the Thrift Plan, the Determination was erroneous because Newport News complied with CAS 415–50(e)(1) in accounting for costs under the Thrift Plan. Count III claimed that the government had released Newport News from any possible liability arising out of non-compliance with CAS 415 through bilateral contract modifications.

On October 1, 1999, the government filed its answer and counterclaim to Newport News' claim. The counterclaim asked the Court to award the government $19,535,000 plus interest, and to dismiss Newport News' complaint with prejudice. Newport News filed its reply to the government's counterclaim on October 25, 1999. On January 7, 2000, Newport News filed a motion for summary judgment pursuant to RCFC 56(c) on Counts II and III of its complaint, and on the Second, Third, Fifth, and Sixth affirmative defenses in its reply to the government's counterclaim.[5] The government filed a response to Newport News' motion and a cross-motion for summary judgment under RCFC 56(c) on March 17, 2000. The cross-motion argued that we should grant summary judgment in the government's favor on the issues presented in Newport News' summary judgment motion. After thorough briefing and oral argument, the Court issues the following opinion granting Newport News' motion for summary judgment and denying the government's cross-motion.

### DISCUSSION

### I. JURISDICTION

The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491 (2002), and the Contract Disputes Act (the "CDA"), 41 U.S.C. §§ 601–613 (2002). The United States, as sovereign, is immune from suit unless Congress specifically waives this immunity. *See United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957). Congress has waived the United States' sovereign immunity under certain circumstances through the Tucker Act, which grants this Court jurisdiction over monetary claims against the United States. *See* § 1491. Section 1491(a)(2) of the Tucker Act states that we have jurisdiction "to render judgment upon any claims by or against, or dispute with, a contractor arising under section 10(a)(1) of the [CDA], including a dispute concerning . . . compliance with cost accounting standards." § 1491(a)(2).

Section 10(a)(1) of the CDA provides government contractors, such as Newport News, with a substantive right to bring an action in the United States Court of Federal Claims "in lieu of appealing the decision of the contracting officer." 41 U.S.C. § 609(a)(1) (2002). The CDA "applies to any express or implied contract . . . entered into by an executive agency for . . . the procurement of property, other than real property." 41 U.S.C. § 602(a)(1) (2002).

### II. STANDARD OF REVIEW

The parties have argued for the dismissal of each other's claims on cross-motions for summary judgment under RCFC 56(c). RCFC 56(c) provides for summary judgment if it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has defined a genuine issue over a material fact as a dispute "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

---

4. CAS 412 addresses "defined-contribution pension plans." 48 C.F.R. § 9904.412–30(a)(4) (2002).

5. The second and third affirmative defenses stated that the government's counterclaim was barred by the doctrine of waiver and the doctrine of accord and satisfaction, respectively. The fifth and sixth affirmative defenses argued that the government's counterclaim was barred by the reasoning set out in Counts II and III, respectively.

S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48, 106 S.Ct. 2505 (emphasis in the original).

Cross-motions for summary judgment are opposing claims made by the parties to a suit whereby each party argues that it alone is entitled to summary judgment. "Where cross motions for summary judgment are presented, the court is not required to grant judgment as a matter of law for either party." *Alexander v. United States,* 28 Fed.Cl. 475, 479 (1993). Thus, "each party's motion must be separately evaluated on its own merits." *Id.*

## III.  ANALYSIS

There is no genuine issue concerning the material facts of this dispute. Resolving this matter therefore depends upon properly applying the relevant law to the facts of the case. The parties' cross-motions turn on two questions concerning interpretation of the law. First, did Newport News use the appropriate measurement date under CAS 415–50(e)(1) for calculating the costs of the Tenneco stock that Newport News used to match employee contributions to the Thrift Plan? Second, if Newport News did not comply with CAS 415–50(e)(1), did the government waive the noncompliance through bilateral contract modifications? We first examine Newport News' alleged noncompliance with CAS 415–50(e)(1) under the Thrift Plan.

CAS 415 provides "criteria for the measurement of the cost of deferred compensation and the assignment of such cost to cost accounting periods." 48 C.F.R. § 9904.415–20(2002). CAS 415 defines "deferred compensation" as "an award made by an employer to compensate an employee in a future cost accounting period or periods for services rendered in one or more cost accounting periods prior to the date of the receipt of compensation by the employee." 48 C.F.R. § 9904.415–30(a)(1) (2002). According to CAS 415, a government contractor's "cost of deferred compensation shall be assigned to the cost accounting period in which the contractor incurs an obligation to compensate the employee."  48 C.F.R. § 9904.415–40(a) (2002).  A government contractor is deemed to have incurred an obligation for the cost of deferred compensation under CAS 415 when the following specified conditions have been met:

(1) There is a requirement to make the future payment(s) which the contractor cannot unilaterally avoid.

(2) The deferred compensation award is to be satisfied by a future payment of money, other assets, or shares of stock of the contractor.

(3) The amount of the future payment can be measured with reasonable accuracy.

(4) The recipient of the award is known.

(5) If the terms of the award require that certain events must occur before an employee is entitled to receive the benefits, there is a reasonable probability that such events will occur.

(6) For stock options, there must be a reasonable probability that the options ultimately will be exercised.

48 C.F.R. § 9904.415–50(a) (2002).

If a deferred compensation plan meets the six conditions of CAS 415–50(a) and the awards to the employee under the plan are made in the contractor's stock, CAS 415 dictates that "the cost of deferred compensation for such awards shall be based on the market value of the stock on the measurement date; i.e., the first date the number of shares awarded is known." 48 C.F.R. § 9904.415–15(e)(1) (2002).

### A.  The Parties' Arguments

The parties offered conflicting interpretations of CAS 415 to fix the measurement date for the cost of the Tenneco stock awarded to Newport News employees under the Thrift Plan. Newport News argued that the appropriate measurement date for the costs was whenever it awarded Tenneco shares to an employee's Thrift Plan account. As previously described, Newport News calculated the size of the award by matching the cash value that an employee contributed to the Thrift Plan with Tenneco shares. The number of shares thereby awarded was based upon the average of the high and low price of

the stock on the NYSE on the day of the award, i.e., the last day of the pay period during which the employee had made the contribution. Regardless of the fluctuating value of Tenneco stock on the NYSE, the award always matched the employee's contribution in terms of raw cash value. This cash value was what Newport News charged the government as a deferred compensation plan cost.

Newport News based this measurement date on the argument that the plain language of CAS 415 provided that deferred compensation awards of a contractor's stock are to be valued as of the "first date the number of shares awarded is known" and "the recipient of the award is known." 48 C.F.R. §§ 9904.415–50(e), (a)(4) (2002). Thus, the transfer of the Tenneco stock to the SECT could not serve as the proper measurement date for costs related to the Thrift Plan for two reasons. First, according to Newport News, Tenneco's transfer of its stock to the SECT in November 1992 was not a deferred compensation award under CAS 415. Second, Newport News claimed that when Tenneco transferred its stock to the SECT, neither the number of shares awarded nor the recipients of the awards were known.

Newport News further alleged that the regulatory history of CAS 415 supported its position. Newport News emphasized that the Preamble to CAS 415 stated that "the cost of deferred compensation is assignable as a contract cost in the period the contractor incurs an obligation to pay such cost which, for many deferred compensation plans, will be the period in which the award is made." 48 C.F.R. § 9904.415.40(a) (2002). Thus, according to Newport News, the proper valuation date for awards made in a contractor's own stock under CAS 415 could only be the date on which a specific number of shares were awarded to the Thrift Plan.

Furthermore, Newport News pointed out that Accounting Principles Board ("APB") Opinion Number 25, which the CAS Board embraced in promulgating CAS 415, stated the following:

Transferring stock or assets to a trustee, agent, or third party for distribution of stock to employees under the terms of an option, purchase, or award plan *does not change the measurement date from a later date to the date of transfer* unless the terms of the transfer provide that the stock (1) will not revert to the corporation, (2) will not be granted or awarded later to the same employee on terms different from or for services other than those specified in the original grant or award, and (3) will not be granted or awarded later to another employee.

APB Opinion Number 25, § 25.11e (emphasis added).

Newport News argued that since the agreement forming the SECT did not contain the three exceptions quoted above in APB Opinion Number 25, the proper measurement date for the Thrift Plan costs was when the Tenneco stock was awarded to Newport News' employees, rather than when the stock was transferred to the SECT. Newport News concluded that its accounting procedures for the Thrift Plan complied with CAS 415, and that it did not overcharge the government for costs reported under the Thrift Plan.

On the other hand, the government argued that the appropriate date to measure the value of the costs of the Thrift Plan stock awards was when Tenneco transferred its stock to the SECT. Thus, the government claimed that costs should have been valued at $36 for every share of Tenneco stock transferred to the SECT.[6] The government first argued that Newport News' method for valuing the costs under the Thrift Plan defeated the purpose for which the CAS Board originally established the concept of a measurement date under CAS 415.

The government emphasized that the regulatory history of CAS 415 indicated that the CAS Board had specifically worded CAS 415–50(e)(1) to prevent the government from sharing with contractors the financial risks posed by fluctuations in the value of the contractor's stock awarded to employees as

---

**6.** At oral argument, the government stated that "[a]ll we're saying is that the way you measure those Tenneco shares is based on the measure-ment date; what it costs Tenneco to transfer 12 million shares to the SECT." Oral Argument Tr. at 35.

part of employee benefit plans.[7] Thus, according to the government, when a company defers the distribution of stocks awarded to employees, the company bears the risk that increases in the stock's value may cause the company to lose money when the shares are finally distributed. The government claimed that by charging the government for the market value of Tenneco stock as of the date that the stock was transferred to its employee benefit plans, Newport News wrongfully required the government to bear the risk associated with future changes in the market value of Tenneco stock.

Similarly, the government alleged that regulators intended CAS 415–50(e)(1) to prevent contractors from exploiting changes in an awarded stock's value to the government's detriment. For example, a contractor could "defray [the] cost[s] resulting from future increases in the market value of the stock" awarded to employees by purchasing the stock in advance as a hedge against potential increases in the stock's value. *See* 41 Fed. Reg. 31, 799 (1976). The contractor could thereby make money at the government's expense by having the government reimburse it for the market value of awarded stock on the day that the company actually distributed the stock to an employee, assuming that the stock increased in value after the initial purchase was made. Accordingly, the government interpreted CAS 415–50(e)(1) to require that stock awards be valued for reimbursement purposes according to the market value of the stock on the day when the number of shares to be distributed and the price of the shares was known to the contractor, rather than when the shares were later distributed to the employee. 48 C.F.R. § 9904.415–50(e)(1) (2002).

The government continued by stating that the recipients and number of shares to be awarded were known for the purposes of CAS 415 when Tenneco transferred the 12,-000,000 shares of stock to the SECT. As opposed to a specific list of award recipients and number of shares awarded, the government stated that "all that is necessary [under CAS 415] is that there be a class of recipients who can be described with sufficient precision such that the number of shares set aside for the purpose of providing deferred compensation may be allocated with reasonable accuracy." Def.'s Reply at 11 (internal citations omitted). The government claimed that the SECT agreement specified the recipients on a collective basis as participants in Tenneco employee benefit programs.

Furthermore, the government opposed Newport News with respect to the effect of APB Opinion Number 25 on setting the measurement date of Thrift Plan stock costs. The government stated that the Tenneco shares in the SECT were irrevocably committed to satisfying Tenneco employee benefit plans. Def.'s Reply at 12–13. The government made this claim despite the fact that the SECT was dissolved in 1996, and that its liquidated assets were returned to Tenneco. According to the government, since the SECT was irrevocable, it fulfilled the three exceptions quoted by Newport News from APB Opinion Number 25, and the date of the transfer of Tenneco's stock to the SECT was therefore the proper measurement date for Thrift Plan costs under CAS 415. *See* APB Opinion Number 25, § 25.11e. The government cited no basis for this assertion, while Newport News' evidence showed that it clearly is not true.

Lastly, the government pointed out that Newport News treated the appreciation of the stock that was transferred to its employees as paid-in-capital, rather than as a cost. In effect, the government alleged that by calling the appreciation of the shares transferred to the Thrift Plan a cost, Newport

7. The government quoted the following provision:

[T]he measurement date for both stock awards and stock option plans should be the first date on which are known both the number of shares to be distributed and the option price, if any.... *if the market price of the stock on the date of distribution is used, the Government, in effect, would be sharing in financial risk-taking* *with the contractor. Subsequent fluctuations of the price of the stock should not influence the measurement of the award....* Consequently, § 415–50(e)(1) has been changed to provide for the measurement of the cost of stock to be at the measurement date rather than the time an obligation was deemed to have been incurred.

41 Fed.Reg. 31, 799 (1976) (emphasis added).

News was seeking reimbursement for sums that Newport News actually considered to be contributions to its capital. In conclusion, the government argued that Newport News' failure to comply with CAS 415–50(e)(1) resulted in the government overpaying the company $19,535,000 in costs.

B. The Measurement Date

After carefully reviewing the parties' arguments, the Court holds that the proper measurement date for valuing Newport News' reimbursable costs was the period when Tenneco stocks were transferred from the SECT and awarded to individual employee Thrift Plan accounts. We base this conclusion on two interrelated determinations concerning the interpretation of the regulations pertinent to this dispute. First, the transfer of Tenneco shares to the SECT in November of 1992 does not qualify as a deferred compensation award under CAS 415, whereas the transfer of Tenneco shares from the SECT to the Thrift Plan does. CAS 415 explicitly defines a deferred compensation award as compensation from an employer to "an employee" for services rendered by the employee prior to the date that the award is received. 48 C.F.R. § 9904.415–30(a)(1) (2002). The award must therefore be made to an *individual* employee, and it must compensate the individual for work that he or she has already performed for the employer. The latter requirement reflects the fundamental principle of government contract cost accounting that employee compensation must be given for work actually performed by the employee receiving the compensation. *See* 48 C.F.R. § 31.205–6(a) (2002) (addressing "[c]ompensation for personal services").

However, the transfer of Tenneco's stock to the SECT was executed *prior* to Newport News' employees performing the work for which they were compensated under the Thrift Plan. Also, the SECT, which funded at least ten other employee benefit plans, was directed towards a *group* of employees that did not even necessarily include Newport News employees. The SECT was therefore little more than a bank, a holding bin for the stock that was to be used to fund a number of Tenneco programs. The transfer of the Tenneco stocks to the SECT was therefore *not* a deferred compensation plan award under CAS 415. Thus, the cost of stocks awarded to Newport News employees pursuant to the Thrift Plan cannot be measured from the date that Tenneco's stocks were transferred to the SECT.

In contrast, the transfer of Tenneco shares from the SECT to the Thrift Plan accounts of Newport News employees qualifies as deferred compensation plan awards. The transfer of Tenneco shares to the Thrift Plan accounts of Newport News employees did not occur until after the end of the pay periods in which those employees made contributions to the Thrift Plan. Thus, the participating Newport News employees had to perform services for Newport News during the pay periods in question before their Thrift Plan accounts received Tenneco shares. Also, the transfer of stock from the SECT to the Thrift Plan involved the compensation of *individual* Newport New employees making contributions to their Thrift Plan accounts.

The Court's second determination follows logically from our first determination: it is not possible to measure the cost of a non-existent award. This impossibility makes sense both intuitively and with respect to CAS 415. For either party to establish a specific date as the proper measurement date under CAS 415, it must first satisfy the six criteria listed under CAS 415–50(a), and must then meet the requirements of CAS 415–50(e)(1). *See* §§ 9404.415–50(a), 50(e)(1). In particular, the party must show that the "number of shares awarded" and that the recipients of the awards were known at the time of the proposed measurement date. §§ 9404.415–50(a), (e)(1).

As discussed above, a deferred compensation plan award was not made when the Tenneco stocks were transferred to the SECT in November 1992. Thus, the number of shares awarded to Thrift Plan accounts during fiscal years 1993 and 1994 could not have been known in November 1992. Contrary to the government's contention, the 12,000,000 Tenneco shares transferred to the SECT did not equal the number of shares awarded as part of the Thrift Plan. Indeed,

1,955,526 shares of the original 12,000,000 SECT shares transferred to the SECT were never awarded to anybody; their cost was never charged to the government. These shares were sold on the open market, and their value was returned to Tenneco in 1996. Moreover, Tenneco created the SECT to provide for at least ten employee benefit plans for Tenneco, its subsidiaries, and affiliates. The Thrift Plan was merely one of these plans, and Newport News was merely one of the Tenneco-related entities participating in the Thrift Plan. During the life of the SECT, only 4,387,673 shares from the SECT were credited to the accounts of all Thrift Plan participants throughout the Tenneco community. Only some 1,528,129 Tenneco shares actually went to the Thrift Plan accounts of Newport News employees.

Similarly, the recipients of Thrift Plan awards could not have been identified in November 1992, because no award was made when Tenneco transferred its stock to the SECT on that date. The government argued that the recipients could be identified generally as a group. This position ignored the fact that the number of Newport News employees participating in the Thrift Plan changed significantly in number and composition over the life of the Thrift Plan as employees were promoted, demoted, dismissed, and hired. Thus, a Newport News recipient of a Thrift Plan award could not have been formally known under CAS 415 until the end of each payroll period in which the individual recipient performed services for Newport News and contributed money to his or her Thrift Plan account. In contrast, specific award recipients and the number of shares constituting their awards were explicitly identified when Newport News matched individual employee contributions to the Thrift Plan with Tenneco stock from the SECT.

Given the above application of the plain meaning of CAS 415 to the facts of this dispute, the government's attempts to use regulatory history to bolster its view of the meaning of CAS 415 are of little use. In construing a regulation's meaning, the regulation's plain language takes precedence over the history of its promulgation. *Lockheed Corp. v. Widnall,* 113 F.3d 1225, 1227 (Fed. Cir.1997) (internal citations omitted). It is unnecessary to examine a regulation's history when the regulation's language is clear, as it is here. *Id.* However, the Court notes that the government's position concerning the regulatory history of CAS 415 with respect to stock market fluctuations makes little sense in view of the facts of this case. We agree with the government that a primary concern of regulators in establishing the notion of a measurement date in CAS 415–50(e)(1) was to protect the government from sharing with government contractors in the financial risks of the stock market, and from being exploited by government contractors hoping to take advantage of stock market fluctuations.

But contrary to the government's position, this case does not implicate either of these concerns because Newport News' participants in the Thrift Plan received Tenneco stock awards from the SECT purely in terms of the cash value that the stock represented, rather than as stock, per se. As previously explained, at the end of every pay period in which an employee had made a contribution to the Thrift Plan, Newport News transferred enough Tenneco shares from the SECT to the Thrift Plan to match the contribution's dollar value. Newport News charged the government for the cost of the stocks based on this same dollar amount. As a result, whether the market value of the Tenneco stock used to match the employee's contribution was higher than, lower than, or equal to the stock's value when it was transferred to the SECT in November of 1992, the cost to the government was exactly the same. Any post–1992 fluctuation in the market price of the stock affected only the number of shares credited to the accounts of Newport News' employees, rather than the cost to the government.

In fact, the only entities that bore a risk in this transaction were the employees of Newport News. If the value of the Tenneco shares fell after Newport News awarded the shares to Thrift Plan accounts, then Newport News employees would, in effect, lose money. Furthermore, because only employees bore the risk associated with the stock awards,

Newport News had no motivation to exploit the government by purchasing Tenneco shares to protect itself from the possibility that the shares might plummet in value before employees exercised the stock awards. In short, stock market fluctuations had *no effect* whatsoever on costs charged to the government pursuant to the Thrift Plan. Ironically, under the government's theory, Newport News and the government would both be speculating prior to individual awards.

Similarly, the government's contention that Newport News improperly sought reimbursement for costs that Tenneco treated as paid-in capital is unavailing. Tenneco treated the appreciation of its stock as paid-in capital only while that stock was held in the SECT. Once the stock was transferred to the Thrift Plan account of a Newport News employee, Tenneco treated the stock as a cost. As discussed above, the SECT was merely a holding bin, and the agreement forming the SECT permitted Tenneco to dissolve the SECT at any time. Consequently, the SECT was formed for Tenneco's own benefit, and Tenneco was free to treat the appreciation of its stock held in the SECT as paid-in capital. On the other hand, awards made from the SECT to the Thrift Plan were irrevocable commitments of Tenneco stocks from the SECT to Thrift Plan accounts. Thus, the stock was properly treated as a cost when that cost was actually incurred pursuant to a Thrift Plan award. Lastly, having determined that we should grant Newport News' motion and deny the government's cross-motion for the above reasons, there is no need to examine the parties' alternative arguments concerning whether Newport News was released from complying with CAS 415 through bilateral contract modifications.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Newport News' Motion for Summary Judgment. The Court DENIES Defendant's Cross Motion for Summary Judgment. The Clerk of Court is directed to enter judgment in favor of Newport News and award attorneys' fees and costs, with interest. The Clerk of Court is further directed to DISMISS the Defendant's Counterclaim in accordance with this opinion.

IT IS SO ORDERED.